Mark Meuser, CASBN 231335 (admitted *pro hac vice*)
**DHILLON LAW GROUP, INC.**
2121 Eisenhower Avenue, Suite 608
Alexandria, VA 22314
703-574-1206
MMeuser@dhillonlaw.com

Timothy A La Sota, AZSBN 020539
**TIMOTHY A. LA SOTA, PLC**
2198 E. CAMELBACK RD., SUITE 305
PHOENIX, ARIZONA 85016
TELEPHONE: (602) 515-2649
tim@timlasota.com
*Attorneys for Defendant Donald J. Trump*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| John Anthony Castro,<br><br>Plaintiff,<br><br>v.<br><br>Secretary of State Adrien Fontes, and Donald J. Trump,<br><br>Defendants. | Case No. 2:23-cv-01865-DLR<br><br>**FIFTH NOTICE OF SUPPLEMENTAL AUTHORITY**<br><br>(assigned to the honorable Douglas L. Rayes) |

Defendant Donald J. Trump provides this fifth notice of supplemental authority in regard to an opinion of the United States Court of Appeals for the First Circuit issued today in *Castro v. Scanlan*, No. 23-1902. The First Circuit affirmed the New Hampshire District Court's dismissal of the lawsuit filed by the Plaintiff here, John Castro, seeking to disqualify Donald J. Trump from the ballot, stating that "although he [Mr. Castro] is a registered

political candidate for president, he has failed to show that he can satisfy what is known as the 'injury-in-fact' component of Article III standing."

The opinion is attached.

**RESPECTFULLY SUBMITTED** this 21st day of November, 2023.

**TIMOTHY A. LA SOTA, PLC**

By: ___/s/ Timothy A. La Sota___
Timothy A. La Sota, AZSBN 020539
2198 East Camelback Road, Suite 305
Phoenix, Arizona 85016
Telephone: (602) 515-2649
Email: tim@timlasota.com
*Attorney for Defendant Donald J. Trump*

2

1

## CERTIFICATE OF SERVICE

2

3   I hereby certify that on November 21, 2023, I electronically transmitted the
    attached document to the Clerk's Office using the CM/ECF system for flinging
4   and transmittal of a Notice of Electronic Filing, with a paper courtesy copy mailed
5   to the Judge on the same day.

6   COPY of the foregoing
7   emailed this 21st day of November, 2023 to:

8
    John Anthony Castro
9   12 Park Pl.
10  Mansfield, TX 76063
    202-594-4344
11  Email: j.castro@castroandco.com
12  PRO SE

13  Kara Karlson
14  Kyle Cummings
    **Office of the Attorney General - Phoenix**
15  2005 N Central Ave.
16  Phoenix, AZ 85004-1592
    602-542-8118
17  Fax: 602-542-8308
18  Email: AdminLaw@azag.gov
    Email: kyle.cummings@azag.gov
19  Attorneys for Arizona Secretary of State

20
    Dennis I. Wilenchik
21  John D. Wilenchik
22  **Wilenchik & Bartness, P.C.**
    2810 North Third Street
23  Phoenix, Arizona 85004
24  admin@wb-law.com
    Attorneys for Intervenor Arizona Republican Party
25
    /s/ Timothy A. La Sota
26

27

28

3

# United States Court of Appeals
## For the First Circuit

No. 23-1902

JOHN ANTHONY CASTRO,

Plaintiff, Appellant,

v.

DAVID SCANLAN, New Hampshire Secretary of State;
DONALD J. TRUMP,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Joseph N. Laplante, U.S. District Judge]

Before

Barron, Chief Judge,
Gelpí and Montecalvo, Circuit Judges.

John Anthony Castro, pro se.
Samuel R.V. Garland, Senior Assistant Attorney General, New
Hampshire Department of Justice, with whom John M. Formella, New
Hampshire Attorney General, and Anthony J. Galdieri, New Hampshire
Solicitor General, were on brief, for appellee David Scanlan.
Gary M. Lawkowski, with whom Ronald D. Colman, Dhillon Law
Group, Inc., Richard J. Lehmann, and Lehmann Major List, PLLC,
were on the brief, for appellee Donald J. Trump.

November 21, 2023

**BARRON**, <u>Chief Judge</u>.    Does Section 3 of the Fourteenth
Amendment to the U.S. Constitution ("Section 3") bar the former
President, Donald J. Trump, from "holding" the Office of President
of the United States again on the ground that he "engaged in
insurrection or rebellion against [the U.S. Constitution], or
[gave] aid or comfort to the enemies thereof"?[1]    John Anthony
Castro filed suit in the federal District Court in New Hampshire
alleging that Section 3 does impose that bar, and, on that basis,
he sought to enjoin the New Hampshire Secretary of State (the
"Secretary") from "accepting or processing" the former President's
"ballot access documentation" for the 2024 Republican presidential
primary in that state.    The District Court then dismissed the suit
on jurisdictional grounds, ruling that Castro lacked standing
under Article III of the U.S. Constitution, <u>see</u> U.S. Const. art.
III, § 2 (limiting "the judicial power" to "Cases" or
"Controversies"), and that his Section 3 claim presented a
nonjusticiable "political question," <u>see</u> <u>Baker</u> v. <u>Carr</u>, 369 U.S.

---

[1]    Section 3 provides: "No person shall be a Senator or
Representative in Congress, or elector of President and Vice-
President, or hold any office, civil or military, under the United
States, or under any State, who, having previously taken an oath,
as a member of Congress, or as an officer of the United States, or
as a member of any State legislature, or as an executive or
judicial officer of any State, to support the Constitution of the
United States, shall have engaged in insurrection or rebellion
against the same, or given aid or comfort to the enemies thereof.
But Congress may by a vote of two-thirds of each House, remove
such disability."    U.S. Const. amend. XIV, § 3.

186 (1962); <u>Rucho</u> v. <u>Common Cause</u>, 139 S. Ct. 2484 (2019).  Castro
now challenges the rulings in this appeal.

Castro's underlying suit raises a host of questions
about the meaning of Section 3 and the role, if any, that federal
courts may play in enforcing it.  The questions range from whether
Section 3 applies to a political party's primary election to
whether the provision's prohibition is self-executing to what kind
of conduct constitutes "engag[ing] in insurrection or rebellion
against the [U.S. Constitution], or giv[ing] aid or comfort to the
enemies thereof."  We may address such questions, however, only if
Castro's suit is a "Case[]" or "Controversy[]" within the meaning
of Article III of the U.S. Constitution.  And, as we will explain,
we conclude that Castro's suit is not because, although he is a
registered political candidate for president, he has failed to
show that he can satisfy what is known as the "injury-in-fact"
component of Article III standing.  Accordingly, we affirm the
District Court's judgment.

## I.

Appearing pro se, Castro filed his complaint in the
District of New Hampshire on September 5, 2023.  The complaint
named as defendants both the Secretary, David Scanlan, and the
former President, Donald J. Trump.[2]  The New Hampshire Republican

---

[2] In their briefings on appeal, the parties dispute former

State Committee later intervened as a party of interest pursuant to Federal Rule of Civil Procedure 24.

Castro alleged in his complaint that he is a U.S. Citizen, a resident of Mansfield, Texas, and a "Republican primary presidential candidate . . . for the 2024 [p]residential election." He further alleged that he was registered as a candidate in that election with the U.S. Federal Election Commission (the "FEC") and that he was "currently competing against Donald J. Trump for the Republican nomination for the Presidency of the United States."

Castro attached a "Verification" to his complaint in which he "declare[d]" that he "intend[ed] to either appear on the 2024 Republican primary ballot in [New Hampshire] or to file documentation to be a formally recognized write-in candidate in both the primary and general elections."[3] The complaint also alleged that "[b]ecause [New Hampshire] permits write-in candidates and their votes to be counted, ballot placement is not

---

President Trump's status as a merely "nominal defendant" against whom Castro seeks no redress. Because we do not reach the issue of redressability, however, we need not resolve this dispute.

[3] "A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes." Fed. R. Civ. P. 10(c); see also Newman v. Lehman Bros. Holdings Inc., 901 F.3d 19, 26 (1st Cir. 2018).

legally determinative of the legal inquiry as to whether an individual is a 'candidate' under [New Hampshire] law."

The complaint asserted that Section 3 "creates an implied cause of action for a fellow candidate to obtain relief for a political competitive injury by challenging another candidate's constitutional eligibility on the grounds that they engaged in or provided 'aid or comfort' to an insurrection." The complaint also asserted that Section 3's bar applies to the Office of the President of the United States and that the bar applies to the former President because his conduct in relation to the last presidential election amounted to providing "'aid or comfort' to an insurrection." The complaint then described various specific actions that the former President assertedly took before and after the 2020 presidential election that, according to the complaint, constitute the kind of conduct that triggers Section 3's bar.

Castro moved on September 17 for a temporary restraining order to prevent the Secretary from accepting the former President's declaration of candidacy and requested an expedited preliminary injunction hearing consolidated with a bench trial on the merits. Castro noted in the motion that the Secretary had announced, on September 13, that the filing period for declarations of candidacy, which candidates must submit along with a $1,000 filing fee in order to appear on the primary ballot in New

Hampshire,[4] would open on October 11 and close on October 27, and Castro asserted that he intended to file his declaration of candidacy and pay his filing fee on October 11.

The Secretary opposed the motion on the ground that Castro lacked standing under Article III of the Constitution, which limits the judicial power to the resolution of "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1; see Webb v. Injured Workers Pharmacy, LLC, 72 F.4th 365, 371 (1st Cir. 2023). To establish standing, a plaintiff must allege the "'familiar amalgam of injury in fact, causation, and redressability,' which injury must be 'both concrete and particularized and actual or imminent, not conjectural or hypothetical.'" Efreom v. McKee, 46 F.4th 9, 21 (1st Cir. 2022) (internal quotation marks omitted) (quoting Hochendoner v. Genzyme Corp., 823 F.3d 724, 731 (1st Cir. 2016)).

Castro alleged in his complaint that he had standing under the doctrine of "political competitor standing," as he alleged that he would "suffer a concrete competitive injury" in

---

[4] See N.H. Rev. Stat. Ann. §§ 655:47 ("The names of any persons to be voted upon as candidates for president at the presidential primary shall be printed on the ballots upon the filing of declarations of candidacy with the secretary of state"), 655:48 ("No candidate for the office of president shall have his or her name placed on the ballot for the presidential primary unless the candidate shall pay to the secretary of state at the time of filing the declaration of candidacy a fee of $1,000.").

the form of "a diminution of votes and/or fundraising" in New
Hampshire if the former President were permitted to appear on New
Hampshire's 2024 Republican primary ballot despite Section 3.  The
Secretary argued, however, that Castro could not establish
standing because he could not satisfy the causation and
redressability requirements.  According to the Secretary, Castro's
alleged injury was traceable only to the former President's
candidacy itself and not to the Secretary's acceptance of the
former President's ballot-access documentation.  In advancing that
contention, the Secretary pointed out that the former President
could run as a write-in candidate in the primary even if the
Secretary were enjoined from placing the former President's name
on the primary ballot.  The Secretary took no position, however,
on whether Castro had alleged an injury in fact, though the
Secretary did urge the District Court to fulfill its "independent
obligation to assure that standing exists." Sec. State Obj. Pl.'s
Req. Injunctive Relief at ¶ 19, Castro v. Scanlan, Civ. No. 23-
0416-JL (D.N.H. Sept. 29, 2023), ECF No. 27 (quoting Hernández-
Gotay v. United States, 985 F.3d 71, 77 (1st Cir. 2021)).

        On the same day that the Secretary filed his opposition
to Castro's motion, the former President moved to dismiss Castro's
complaint for lack of subject matter jurisdiction pursuant to
Federal Rule of Civil Procedure 12(b)(1).  The former President's

- 7 -

motion incorporated the Secretary's causation and redressability arguments and asserted that Castro had not established standing because he had failed to satisfy the injury-in-fact requirement. The motion argued that Castro had "fail[ed] to plausibly allege that [competing with the former President] injures him in any particularized or concrete fashion," such as by "identif[ying] a single voter who identifies Castro as his or her 'second choice' after Donald Trump" or otherwise "support[ing] the inherently improbable claim that there is a latent Castro movement that would surface, if only Trump [were] not on the ballot."  In addition, the motion asserted that Castro's Section 3 claim presented a nonjusticiable political question.

The District Court held an evidentiary hearing on October 20 on the question of jurisdiction.  Prior to the hearing, Castro submitted an affidavit and receipt showing that on October 11, which was five weeks after he had filed his complaint, he had filed his New Hampshire declaration of candidacy and paid the requisite $1,000 filing fee to the Secretary.  At the evidentiary hearing, the District Court admitted into evidence both Castro's affidavit and receipt as well as the parties' joint stipulation of facts.

The District Court then heard the testimony of Michael Dennehy, a witness put forward by the New Hampshire Republican

State Committee and a political consultant and campaign strategist. Dennehy testified to his opinion that Castro "[i]s not a serious candidate" for president and that Trump's absence from the New Hampshire primary ballot "would have no impact" on Castro's primary chances "[b]ecause there is no activity to [Castro's] campaign." Dennehy did acknowledge that he had located and viewed a website advertising Castro's presidential campaign, but he described the website as "amateur," "incomplete," and "certainly not what you would consider a national campaign website."

Finally, the District Court heard testimony from Castro, who asserted that he planned to "ramp up [his campaign] activities" leading up to the New Hampshire primary. But on cross-examination, Castro admitted that his campaign, to date, had employed no staff in New Hampshire or any other state, had run no advertisements in New Hampshire or any other state, and had engaged in no campaign activities in New Hampshire or any other state "apart from lawsuits" similar to this one. Castro also confirmed that, in a series of Twitter posts published on November 18, 2021, he had "stated [his] belief that Section 3 of the Fourteenth Amendment disqualified Donald Trump from holding public office," written that "only a fellow Republican presidential primary candidate has federal judicial standing to sue Trump to remove him from the

- 9 -

ballot," and then announced that he "intend[ed] to pursue the
Republican nomination for the presidency of the United States in
2024 [and to] bring a federal lawsuit against Trump to disqualify
him from being on the ballot in every swing state."  As to the
issue of his forward-looking "campaign strategy," Castro averred,
"Keep watching and learn."

A week after the hearing, on October 27, the District
Court issued a memorandum and order that denied Castro's request
for injunctive relief and granted the former President's motion to
dismiss Castro's complaint for lack of subject matter
jurisdiction.  The District Court reasoned that Castro had failed
to establish that he had standing and that his Section 3 claim
presented a political question.

With respect to standing, the District Court first
determined that Castro had failed to satisfy the injury-in-fact
requirement.  The District Court reasoned that Castro had made "no
attempt to demonstrate that he is actually competing with Trump
for votes and contributions, as required under the operative
competitor standing theory"; that the alleged injury was too
"speculative, as it depends on what voters and contributors . . .
may do if Trump's name is not listed on the New Hampshire primary
ballot"; and that, by filing as a Republican presidential primary
candidate, Castro had impermissibly attempted to "creat[e] his own

- 10 -

injury in order to manufacture standing to challenge Trump's eligibility to run for president."

The District Court also concluded that Castro failed to establish standing because had not met his burden to satisfy the causation and redressability requirements. The District Court reasoned that Castro had not shown that his alleged injury was traceable to the Secretary or that it could be redressed by the requested relief because "Castro acknowledges[] that [the former President's] absence from the primary ballot would not affect the number of votes or contributions Castro would receive."

The District Court then shifted focus and explained why, the issue of standing aside, the complaint had to be dismissed because Castro's Section 3 claim presented a nonjusticiable political question. Here, the District Court determined that "state and federal district courts have consistently found that the U.S. Constitution assigns to Congress and the electors, and not the courts, the role of determining if a presidential candidate or president is qualified and fit for office -- at least in the first instance."

In so ruling, the District Court rejected as "wholly underdeveloped and unsubstantiated" Castro's argument that the political question doctrine did not bar his suit because the political question cases that the defendants cited "were initiated

- 11 -

or decided after the political parties held their national
conventions to select presidential nominees," and that "this
circumstance alone 'proves that the political question doctrine
applies only after the major political parties hold their
conventions.'" Observing that Castro had not presented "any
factual or legal authority" on which to rest such a distinction,
the District Court found that it could not accept Castro's
position.

Castro timely filed his notice of appeal. He then
requested an expedited briefing schedule, which we granted, though
we denied his motion for initial hearing en banc.

In his brief on appeal, Castro takes aim at both grounds
that the District Court gave for dismissing the complaint. Castro
notes in his brief, with respect to standing, that on October 23,
the former President filed his declaration of candidacy in New
Hampshire and paid the requisite $1,000 filing fee to the
Secretary.[5] Castro also argues that the District Court erred by
not "reserv[ing] ruling on jurisdiction to allow the facts [to]

_____

[5] Because the sole relief that Castro seeks is an injunction
preventing the Secretary from "accepting [or] processing . . .
Trump's ballot access documentation," there is a question as to
whether this case is moot. See Harris v. Univ. Mass. Lowell, 43
F.4th 187, 191-92 (1st Cir. 2022). But because we conclude that
Castro lacks standing, we need not address this potential
alternative ground for dismissal, which we note the parties have
not briefed.

materialize" that Castro claims establish his standing, including that he ultimately registered as a New Hampshire primary candidate and has since "dispatched campaign staffers to New Hampshire to knock on doors and place hundreds of campaign signs" and ordered "thousands of postcards" to mail to New Hampshire voters.  He asserts in that regard that the District Court's standing ruling rested on a "baseless assumption that [Castro] would never engage in <u>any</u> campaign activity in New Hampshire," and he asks us to reverse and remand for a trial on the merits of his request for injunctive relief.

## II.

The District Court dismissed Castro's complaint on two independently sufficient jurisdictional grounds.  <u>See</u> <u>Schlesinger</u> v. <u>Reservists Comm. to Stop the War</u>, 418 U.S. 208, 215 (1974) (summarizing that "the concept of justiciability . . . embodies both the standing and political question doctrines," such that "either the absence of standing or the presence of a political question suffices to prevent the power of the federal judiciary from being invoked by the complaining party").  We confine our analysis, however, to the issue of standing and, specifically, to the question of whether Castro has met his burden to satisfy the injury-in-fact requirement, <u>see</u> <u>TransUnion LLC</u> v. <u>Ramirez</u>, 141 S. Ct. 2190, 2207-08 (2021).  We do so both because Castro has clearly

- 13 -

failed to meet that burden and because of the limited nature of the arguments that he makes about the more generally consequential political question issue. Cf. Doe v. Bush, 323 F.3d 133, 139-40 (1st Cir. 2003) (clarifying that this court affirmed dismissal "based on ripeness rather than the political question doctrine," and noting that like the Supreme Court, "[o]ur court has been similarly sparing in its reliance on the political question doctrine").

### A.

In undertaking our independent obligation to ensure that Castro has met his burden to satisfy the injury-in-fact requirement, Hernández-Gotay, 985 F.3d at 77, we emphasize that the facts that matter are "the facts as they existed at the time the [operative] complaint was filed." Steir v. Girl Scouts of the USA, 383 F.3d 7, 15 (1st Cir. 2004) (citing Mangual v. Rotger-Sabat, 317 F.3d 45, 58 (1st Cir. 2003)); see Keene Corp. v. United States, 508 U.S. 200, 207-08 (1993) (in affirming a motion to dismiss for lack of jurisdiction, considering the facts as they existed at the time the complaint was filed, rather than, as plaintiff urged, at the time of the trial court's ruling on the motion to dismiss); see also Lujan v. Defs. of Wildlife, 504 U.S. 555, 569 n.4 (1992) (rejecting the theory that events after the filing of a suit's operative complaint had "retroactively created

- 14 -

a redressability (and hence a jurisdiction) that did not exist at
the outset" of litigation).  Castro thus cannot show that he has
satisfied the injury-in-fact requirement on the basis of
developments that concern his participation in the New Hampshire
Republican presidential primary that occurred <u>after</u> he filed his
complaint, even assuming that those developments might suffice to
establish that he did have standing as of that time but not before.

Notably, Castro does not suggest that his claimed injury
stems from a restriction that has been placed on his ability to
run in the 2024 New Hampshire Republican presidential primary.  He
contends that his injury stems solely from the absence of a
restriction on the ability of someone else to run in that race.
Castro thus premises his claimed injury-in-fact entirely on a
theory of political competitor standing, <u>see, e.g.</u>, <u>Tex.</u>
<u>Democratic Party</u> v. <u>Benkiser</u>, 459 F.3d 582, 586-87 (5th Cir. 2006);
<u>Shays</u> v. <u>FEC</u>, 414 F.3d 76, 83, 87 (D.C. Cir. 2005); <u>Fulani</u> v.
<u>League of Women Voters Educ. Fund</u>, 882 F.2d 621, 626-27 (2d Cir.
1989), even though neither our Circuit nor the Supreme Court of
the United States yet has had occasion to expressly recognize that
theory.

That said, the theory of standing that Castro asks us to
accept derives its logic from a standing doctrine that the Supreme
Court and our Circuit <u>have</u> expressly recognized: the doctrine of

- 15 -

economic competitor standing.   See Clinton v. City of New York,
524 U.S. 417, 433 (1998); Adams v. Watson, 10 F.3d 915, 921–22
(1st Cir. 1993).  Under that doctrine, a plaintiff can satisfy the
injury-in-fact   requirement   based   on   a   showing   of   "probable
economic injury resulting from [governmental actions] that alter
competitive conditions."  Clinton, 524 U.S. at 433 (alteration in
original) (quoting 3 K. Davis & R. Pierce, Admin. L. Treatise 13–
14 (3d ed. 1994)).

      The logic of the economic competitor standing doctrine
is "firmly rooted in the basic law[] of economics" that one direct
competitor's gain of market share is another's loss.   United
Transp. Union v. Interstate Com. Comm'n, 891 F.2d 908, 912 n.7
(D.C. Cir. 1989).  Not surprisingly, therefore, "[i]mplicit in the
reasoning"   of   the   cases   that   recognize   economic   competitor
standing is "a requirement that in order to establish an injury as
a competitor a plaintiff must show that he personally competes in
the same arena with the party to whom the government has bestowed
the assertedly illegal benefit."  In re U.S. Cath. Conf. (Abortion
Rights Mobilization Inc. v. Baker), 885 F.2d 1020, 1029 (2d Cir.
1989).

      In other words, the notion that a competitive injury can
satisfy   the   injury-in-fact   requirement   is   "premised   on   the
[plaintiff's]   status   as   a   direct   and   current   competitor   whose

- 16 -

bottom line may be adversely affected by the challenged government action." New World Radio, Inc. v. FCC, 294 F.3d 164, 170 (D.C. Cir. 2002) (emphasis in original).  At the same time, to show such an injury, a plaintiff need not show "currently realized economic loss." Watson, 10 F.3d at 920–21 (emphasis in original).  However, if a plaintiff who seeks to show such an injury does not show an already realized loss, then the asserted injury must be premised, "at a minimum, on particularized future economic injury which, though latent, nonetheless qualifies as imminent."[6]  Id.

We do also note, however, that although the parties make no mention of it, there is precedent from our Circuit that draws on the logic of the theory of political competitor standing without directly adopting it.  See Becker v. Fed. Election Comm'n, 230 F.3d 381, 385–89 & n.5 (1st Cir. 2000) (concluding that third-party presidential candidate Ralph Nader had standing to challenge

---

[6] In a case upon which Castro relies heavily, Mendoza v. Perez, 754 F.3d 1002, 1014 (D.C. Cir. 2014), the D.C. Circuit held that a group of plaintiffs had standing to challenge conditions in the sheep herding market even though they did "not currently work as herders and ha[d] not filled out formal job applications."  This was because the plaintiffs were nonetheless still "informal[ly]" but directly and currently "involve[d] in [the] market" due to their continued monitoring of it with the intention and ability to enter it "if conditions improve[d]."  Id.  In recognizing that "informal" involvement in a market can satisfy competitor standing, Mendoza did not undermine the rule that a plaintiff must show that they are "in fact a direct and current competitor" to have competitor standing.  Air Excursions LLC v. Yellen, 66 F.4th 272, 280 (D.C. Cir. 2023) (discussing Mendoza) (internal quotation marks omitted).

FEC regulations permitting corporate sponsorship of presidential debates because the regulations "threatened to force Nader to decline an invitation to participate in the debates, and that threat affected the conduct of his campaign" and put him "at a competitive disadvantage in the presidential race"); see also Vote Choice, Inc. v. DiStefano, 4 F.3d 26, 37 (1st Cir. 1993) (concluding that a gubernatorial candidate had standing to challenge a state public campaign financing scheme in part because "having decided to forgo [public financing], she had to structure her campaign to account for her adversaries' potential receipt of television time, fundraising advantages, and the like").  We draw on this precedent, too, in the analysis that follows.

**B.**

Castro contends that he can satisfy the injury-in-fact requirement here because he can show that he is "a direct and current competitor" of the former President in the 2024 New Hampshire Republican presidential primary, New World Radio, 294 F.3d at 170 (emphasis in original).  Thus, Castro's contention on appeal is that the District Court erred in determining that he failed to show that he was a competitor of such a direct and current kind.

Because political markets are hardly governed by the same "basic law[]" as economic ones, United Transp. Union, 891

F.2d at 913 n.7, there is necessarily some uncertainty as to how we should analogize the political realm to the economic one for standing purposes.  As a result, there is also some uncertainty as to what it means to be a "direct and current" competitor in the political context.  We find some guidance, though, in the fact that Article III empowers federal courts to address only "Cases" or "Controversies."

This limitation on the judicial power prevents a plaintiff from invoking the Article III jurisdiction of a federal court by asserting what is merely a "general interest common to all members of the public."  Carney v. Adams, 141 S. Ct. 493, 499 (2020) (quoting Lance v. Coffman, 549 U.S. 437, 440 (2007) (per curiam)).  Therefore, we must be careful not to define "a direct and current competitor" in the political context, New World Radio, 294 F.3d at 170 (emphasis omitted), in a manner that would "weaken the longstanding legal doctrine preventing [federal courts] from providing advisory opinions at the request of one who, without other concrete injury, believes that the government is not following the law." Carney, 141 S. Ct at 501.

As a result, we cannot define a "direct and current competitor" in the political context so loosely that a claim of political competitor injury becomes a means by which a federal court entertains a suit based on what is, in effect, a generalized

concern that a particular individual is not lawfully entitled to run for office.  We must define such a competitor in a manner that ensures that the plaintiff who claims political competitor standing has "[t]he requisite personal interest," id. at 499 (citation and quotation marks omitted), in the determination of the constitutionality of a rival candidate's eligibility for office in consequence of a "concrete, particularized 'injury in fact' over and above the abstract generalized grievance suffered by all citizens . . . who (if [the plaintiff] is right) must live in a State subject to an unconstitutional" electoral process.  Id.

This conclusion accords, we add, with our decision in Becker.  There, we held that a presidential candidate, Ralph Nader, had standing to challenge the FEC's regulations permitting corporate sponsorship of debates put on by the Commission on Presidential Debates ("CPD").  Becker, 230 F.3d at 385-89.  We explained that Nader satisfied the injury-in-fact requirement by showing that the FEC's regulations put him to the "coerced choice" of either participating in a presidential debate with corporate sponsorship or suffering a competitive disadvantage by not participating.  See id. at 387.

We then went on in a footnote to describe as "flawed" the FEC's contention that Nader could not satisfy the causation component of standing.  See id. at 387 n.5.  We explained that the

- 20 -

FEC had argued that insofar as Nader was claiming standing based on the FEC's having placed him at a competitive disadvantage in the presidential race, the FEC had so placed him only by giving a benefit to the CPD.  See id.  Yet, the FEC emphasized, Nader was not "compet[ing] in the same arena" as the CPD itself.  Id.  We were not persuaded because, as we pointed out, the FEC's argument ignored the fact that the challenged FEC regulations resulted in "free television exposure for the debate participants; and obviously Nader competes in the same arena with these other candidates."  Id. (emphasis added).

Against this backdrop, we conclude that for Castro to show that he was a "direct and current competitor" at the time he filed his complaint he must show, at the very least, that at that time he was "competing" with the former President and that he was doing so in the 2024 New Hampshire Republican presidential primary itself.  Otherwise, we do not see how Castro can show that at the time he was "compet[ing] in the same arena" with the former President, id., and that he stood to be "adversely affected [in that arena] by the challenged government action."  New World Radio, 294 F.3d at 170.  In addition, we conclude that for Castro to show that he was a "direct and current" competitor at that time, id. -- or, to use Becker's way of putting it, that he was a competitor "in the same arena," 230 F.3d at 387 n.5 -- he must

show that he was then competing with the former President for voters and/or contributors in that primary.

Our reasons for this last conclusion are as follows. Not even Castro disputes that, to distinguish his claimed injury from a generalized interest in ensuring legal compliance, he must show that his status as a political candidate gave rise to the kind of injury that he claims. And Castro himself describes his injury in his complaint as "a diminution of votes and/or fundraising" in the primary at issue. Thus, it stands to reason that he must show that, at the time of his complaint, he was competing with the former President for voters or contributors in relation to the New Hampshire race itself -- or, at the least, that it would not be overly speculative to conclude that he would do so. For, otherwise, his claimed injury would not be "concrete and particularized," and would instead be "conjectural or hypothetical." Carney, 141 S. Ct. at 498 (quoting Lujan, 504 U.S. at 560-61).

### C.

Having laid out the applicable legal framework in some detail, we are now ready to apply it to the record at hand. As we will explain, we conclude that, reviewing de novo, see Bingham v. Massachusetts, 616 F.3d 1, 5 (1st Cir. 2010), Castro has failed to show that he was a "direct and current competitor."

- 22 -

1.

As an initial matter, Castro did not allege in his complaint that, when he filed it, he was on the ballot in the 2024 New Hampshire Republican presidential primary, had taken the steps necessary for him to appear on that ballot, or even intended to take such steps. Instead, with respect to that primary, he merely stated in the "Verification" attached to his complaint that he "intend[ed] to <u>either</u> appear on the 2024 Republican primary ballot in [New Hampshire] <u>or</u> to file documentation to be a formally recognized write-in candidate in both the primary and general elections" (emphasis added). It was on that limited basis that, at the time of the complaint's filing, he asserted: "<u>As such</u>, I will maintain 'standing' throughout the course of this litigation" (emphasis added).

The Verification's conditional phrasing shows -- at least concretely -- no more than that Castro intended, at the time of the complaint, to seek documentation that would permit him to become a "formally recognized" write-in candidate in the New Hampshire Republican presidential primary. Moreover, the record reveals that thereafter Castro made no showing that, as of the time of filing his complaint, he was in fact competing for votes or contributions in that contest, let alone competing with the former President for them. In fact, while Castro alleged that at

- 23 -

the time of the complaint's filing he had registered with the FEC as a candidate for President, he stipulated (and later confirmed through his testimony at the evidentiary hearing) that, as of that time, and indeed for weeks afterward, he did "not yet have a campaign office in New Hampshire," did "not yet have employees in New Hampshire," was "not yet running any advertisements in New Hampshire," and was "not yet engaging in campaign activities in New Hampshire other than this lawsuit" (emphasis added).  And, with respect to the question of whether he had a "campaign strategy," Castro asserted, "Keep watching and learn."

Thus, the record from the evidentiary hearing reveals what is at most an overly speculative basis for finding that, as of the time of the filing of the complaint, Castro intended to do more than take steps that would enable him to qualify as an "officially recognized" write-in candidate.  But no authority of which we are aware -- or that Castro has identified -- suggests that the mere statement of an intention to seek write-in votes suffices in and of itself to make an individual a "current and direct competitor." New World Radio, 294 F.3d at 170.  In fact, persuasive authority is directly to the contrary, as Sibley v. Alexander explains that a plaintiff's "status as a write-in candidate is insufficient" to establish injury-in-fact, 916 F. Supp. 2d 58, 61 (D.D.C. 2013), "because if it were sufficient any

citizen could obtain standing (in violation of Article III of the U.S. Constitution) by merely 'self[-]declaring.'"  Sibley v. Obama, No. 12-5198, 2012 WL 6603088, at *1 (D.C. Cir. Dec. 6, 2012) (internal citation omitted).

Thus, for all the record shows, Castro was, at least as of the time of the complaint, in a similar position to the plaintiffs in Liberty Legal Foundation v. National Democratic Party of the USA, Inc., 875 F. Supp. 2d 791 (W.D. Tenn. 2012), aff'd 575 F. App'x 662 (6th Cir. 2014).  Those plaintiffs claimed to be "candidates" for the presidency in the 2012 general election in Tennessee and they claimed on that basis to have standing to challenge then-President Obama's eligibility to appear on the ballot in that contest.  Id. at 800-01.  But those plaintiffs were deemed not to have satisfied the injury-in-fact requirement for standing because they had not alleged that they were "truly in competition" with their claimed rival, as they had not shown either that they "w[ould] appear" on the relevant ballot or that "[they were] campaigning in the state of Tennessee, [or] that any registered voter in Tennessee intend[ed] to cast a vote for [them]."  Id.  The district court in that case, we note, also determined that those plaintiffs had not done anything to show "that President Obama's presence on the ballot [would] in any way injure either candidate's campaign."  Id. at 801.

Notwithstanding <u>Sibley</u> and <u>Liberty</u>, Castro develops no argument that he can satisfy his obligation to show injury-in-fact at the time of his complaint if he can show no more than the unsuccessful litigants in those cases did.  And even though neither <u>Sibley</u> nor <u>Liberty</u> binds us here, we do not see how we may accept a definition of a "direct and current competitor" in the political context that is based on a plaintiff's mere "self-declaration" of political candidacy.

Were we to do so, we would be doing what the Supreme Court explained that it was taking care not to do in <u>Carney</u>: "weaken[ing] the longstanding legal doctrine" that prevents federal courts from offering advisory opinions about whether the law is being followed.  141 S. Ct. at 501.  We would be doing so, moreover, in a case that asks us to render an opinion on a matter as important to our democratic system of government as any that is likely to arise in connection with a claim of political competitor standing: may a former President run for the Office of the President of the United States again even if he is shown to "have engaged in insurrection or rebellion against the [U.S. Constitution], or given aid or comfort to the enemies thereof"?  The nature of the question itself shows the need for us to ensure that the limits on our power to render advisory opinions remain as

strong after we decide this case as they were before it came to us.

We add, too, that our analysis in Becker points in the same direction. We made clear there that we should not "second-guess a candidate's reasonable assessment of his own campaign" by "assum[ing]" the "guises" of "campaign consultants or political pundits" in assessing the candidate's assertion of how a challenged governmental action affects their capacity to compete politically. Becker, 230 F.3d at 387 (emphasis added). But, at the same time, we were careful in Becker not to adopt a rule that would "grant[] standing to any political entrant to challenge" any aspect of an election that might "someday" affect them, id. at 386 n.4 (emphasis in original) (internal quotation marks omitted), and we therefore required the candidate to show a "plausible" chance of being competitively affected by the conditions that they challenged. Id.

It follows that, on this record, we must conclude that Castro has not shown what he must to establish that he was a direct and current competitor at the time that he filed his complaint. Accordingly, it follows that he has not shown that, as of that time, he had satisfied the injury-in-fact component of the standing inquiry.

- 27 -

**2.**

We are not quite finished.  The reason is that we are aware that there is evidence in the record that shows that, <u>after</u> Castro filed the operative complaint, he expressed his intent to travel to New Hampshire on October 11 to file his declaration of candidacy and pay the $1,000 filing fee to appear on the state's 2024 Republican presidential primary ballot -- and that on October 11, he did so.

True, Castro did not amend his complaint at that time.  And, as we have explained, he cannot predicate his standing on post-complaint developments.  <u>See</u> <u>Keene Corp.</u>, 508 U.S. at 207–08.  Nor is it evident what issues concerning mootness or remedies may arise in relation to any new complaint that may be filed based on those developments.  Nonetheless, Castro does appear to be contending that a plaintiff who sues to block another's access to the ballot necessarily shows that he is a direct and current competitor  --  and  thus  satisfies  the  injury-in-fact requirement -- by showing that he will appear (or is likely to appear) on the relevant ballot.  And if that contention were correct, it would be evident that an amended complaint in this case might be filed that could suffice to satisfy the injury-in-fact requirement.

The precedents that Castro cites in support of this contention, though, do not support such a sweeping proposition, at least given the nature of the plaintiffs who were involved in those cases and the circumstances of them. See Shays, 414 F.3d at 82 (sitting members of Congress seeking re-election); Fulani, 882 F.2d at 625–26 ("significant" third-party candidate for presidential election contesting the criteria for invitation to national debate, which invited only "significant" candidates belonging to a major party, and "not claim[ing] the [debate] was obligated to include . . . every individual who had announced his or her candidacy"). Nor are we aware of any case that, when considered in context, would support such a broad proposition. Cf. Becker, 230 F.3d at 386 (observing that it was "certainly possible that Nader would be able to meet the . . . fifteen-percent showing of support in the national polls" required to qualify for the presidential debates at issue).

We also do not see how the logic of political competitor standing requires this categorical conclusion. In some cases, the record might reveal that the only activity in relation to the race in which a plaintiff seeking such standing engaged -- beyond, that is, taking steps to secure ballot access like those Castro took here -- was the pursuit of the legal challenge itself. And, in such cases, the record might also show scant indication that any

- 29 -

foreseeable future activity by the plaintiff in relation to that race would amount to anything more than the further pursuit of that legal challenge.

In cases with such a record, though, we could not agree that the plaintiff had political competitor standing. And that is because, given that record, we could not agree that the likely prospect of the plaintiff's nominal appearance on the ballot would suffice in and of itself to show a competitive injury with the requisite degree of concreteness and particularity.

After all, although steps to secure ballot placement may suffice on their own to show some kinds of injury-in-fact, cf. Carney, 141 S. Ct. at 502, a plaintiff like Castro who asserts political competitor standing does not predicate the claimed injury on a bar to the plaintiff's right to receive votes or campaign funds. Rather, such a plaintiff predicates the claimed injury on a failure to limit someone else's right to campaign or receive votes, as it is that failure that is claimed to give rise to the competitive injury.

Thus, because a plaintiff incurs the kind of competitive injury that grounds Castro's assertion of standing by actually being a putative rival's competitor for either votes or contributions, we cannot agree that a showing that a plaintiff has taken the steps required to be placed on the ballot in the primary

- 30 -

contest at issue necessarily always suffices to show such an injury.  Indeed, if the rule were otherwise, then the theory of political competitor standing would seem to offer those invoking it a significant means of effecting an end-run around the usual bar to a federal court's power to remedy what is in the end merely a generalized grievance.  For, under a rule of that sort, plaintiffs would be permitted to secure standing without adequately distinguishing their interest in the legal outcome of the case from that of anyone in the same state who is interested in ensuring legal compliance with that state's ballot access rules for candidates.  And, we note once again, <u>Becker</u> shows that our own precedent is not to the contrary.  See <u>Becker</u>, 230 F.3d at 386 n.4 (declining to adopt a rule that would "grant[] standing to <u>any</u> political entrant to challenge" any aspect of an election that might "<u>someday</u>" affect them (emphasis in original) (internal quotation marks omitted)).

This general point can be made more concrete by zeroing in on the features of the record that show what Castro did, post-complaint, when he went to New Hampshire to secure his placement on the ballot.  Notably, the record gives no indication that Castro was competing even as of that time in the primary race at hand in a way that could show that he had suffered -- or was at imminent risk of suffering -- a diminution in either votes or contributions

absent his requested relief.  Cf. Shays, 414 F.3d at 82; Fulani, 882 F.2d at 625–26.

In that regard, Castro's brief points to nothing in the record that refutes the District Court's determination that "Castro makes no attempt to demonstrate that he is actually competing with Trump for votes and contributions."  Indeed, the record shows that, beyond taking steps to be placed on the ballot, Castro's efforts to compete for votes and contributors in the specific New Hampshire primary at issue were non-existent.  And, consistent with that conclusion, we note that Castro's brief also cites to nothing in the record that undermines the District Court's findings that Castro neither "provided any evidence suggesting that he has voters or contributors in New Hampshire" nor made any showing that "he will benefit from voter or contributor defections from Trump to himself."[7]

Thus, on this record, any claim that the former President's presence on the ballot in the contest at issue will diminish Castro's votes or contributions is simply too speculative to credit, even allowing for the probabilistic nature of a claim

---

[7] We note that the District Court found Castro's testimony "about his media coverage" unpersuasive because "[t]he court ha[d] no way of knowing whether the purported media coverage focused on Castro as a candidate actually seeking the Republican nomination for president, or as a litigant seeking to disqualify Trump." Castro points to nothing in the record that contradicts that assessment.

- 32 -

of competitive injury.   And we see no reason to conclude that a claim of political competitive injury that is purely conjectural fares any better than a purely conjectural claim of injury otherwise does.   Cf. Watson, 10 F.3d at 923 (explaining that an allegation of standing must be more than "unadorned speculation").[8]

**III.**

For these reasons, the judgment of the District Court is **AFFIRMED**.

---

[8] The District Court also concluded that Castro could not satisfy the causation and redressability elements of standing because "Trump's absence from the primary ballot would not affect the number of votes or contributions Castro would receive."   On this record, as discussed above, we have concluded that Castro did not show injury because he was not competing at all.   We thus have no reason to address those other components of standing in this case.   We do note, though, that, as the District Court recognized, if a further claim of standing is advanced based on post-complaint developments in the relevant primary race, assessments of causation and redressability, like injury-in-fact, will depend on the state of the record as it will exist at the time of the advancement of that claim.